# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**WILMECIA ROBINSON,**
    **Plaintiff,**

**v.**

**ALEX POPLAWSKI,**                                  **JURY TRIAL DEMANDED**
**in his individual capacity**

**AND**

**SUMNER COUNTY**
    **Defendants.**

## COMPLAINT

Plaintiff, Wilmecia Robinson, files this Complaint against Poplawski in his individual capacity, and Sumner County, to recover all permissible damages under controlling federal and state law, including: false arrest; intentional infliction of emotional distress; malicious prosecution; and Section 1983.

## INTRODUCTION

1. Defendant Alex Poplawski ( hereinafter "Poplawski") humiliated Ms. Robinson while knowing the entire time she was not intoxicated in the least bit, which ultimately was supported by not one, but two, blood test demonstrating zero alcohol in her system.

2. And, unbelievably, Poplawski's anger rose so high because Ms. Robinson called 911 to obtain a non-emergency number so that she could get a

supervisor on the scene—Poplawski actually charged Ms. Robinson with abuse of 911 calls.

3. Even worse, Poplawski ultimately told Ms. Robinson that he knew she was not intoxicated, yet, Poplawski wrote that she was heavily intoxicated in his incident report.

4. Ultimately, Poplawski did not even show up to Ms. Robinson's arraignment, but not until after she had to endure these charges for nearly one year and all the humiliation and degradation that came with the patently unlawful conduct of Poplawski.

## JURISDICTION AND VENUE

5. Jurisdiction is proper under 28 U.S.C. § 1331 and 1343(a)(4).

6. Venue is proper under 28 U.S.C. § 1391(b) since: (1) a substantial part of the events and omissions giving rise to Ms. Robinson's claims occurred within this District and Division; and (2) Defendants reside and transact business in this District and Division.

## PARTIES

7. Wilmecia Robinson is both a citizen of Tennessee and the United States at all times relevant to this Complaint.

8. Poplawski, at all times relevant, was a deputy with the Sumner County Sheriff's Office.

9. Poplawski had a duty to know all laws governing his conduct as a certified law enforcement officer, including laws, policies, and procedure regarding the stop and search of vehicles within his jurisdiction and the arrest of persons for offenses such as DUI.

10. At all times relevant, Poplawski was acting under color of state law and under color of the Sumner County Sherrif's Office as demonstrated by, inter alia, Poplawski: being on duty; in full deputy uniform; and driving his deputy car at the time he performed a traffic stop of Plaintiff and thereafter, unlawfully arrested Plaintiff.

11. Defendant Sumner County (hereinafter "Sumner County) is a county duly created and incorporated under the laws of Tennessee.

12. Sumner County is capable of being sued pursuant to Tenn. Code Ann. § 8-8-302, which states: "Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office."

13. Poplawski at all times relevant was a Sumner County Deputy who was acting under "color of the office" as contemplated by Tenn. Code Ann. § 8-8-302 and as described in this Complaint, when Deputy Poplawski,

while driving his Sheriff issued patrol vehicle, performed a traffic stop in full deputy uniform while violating Plaintiff's constitution and statutorily protected rights as described in this Complaint.

## STATEMENT OF FACTS

**A. About Ms. Wilmecia Robinson.**

14. Ms. Robinson was born in Muncie, Indiana; her father worked as a detective, and her mother worked for General Motors.

15. Ms. Robinson graduated from Franklin High School in Franklin, Tennessee.

16. After high school, Ms. Robinson attended college for a period of time before deciding to pursue cosmetology school.

17. Ms. Robinson's employment and business history eventually led her into entrepreneurship.

18. She first worked in cosmetology, later became involved in real estate, owned a clothing and hair store, and currently owns and operates a bail bond company.

19. Ms. Robinson moved to Gallatin, Tennessee, at the end of December 2024 and once there she began being harassed by the police.

**B. Harassing conduct prior to the conduct at issue in this case.**

20. On one occasion, a deputy stopped Ms. Robinson while she was driving her Jeep.

21. The officer advised that he was conducting a "wellness check."

22. The subject officer did not articulate any basis for the stop mindful that the Supreme Court of Tennessee has established that a wellness stop must establish that the community caretaking exception applies, by showing that "(1) the officer possessed specific and articulable facts, which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need." State v. McCormick, 494 S.W.3d 673, 675 (Tenn. 2016).

23. During the stop, referenced in the immediately preceding paragraph, the officer commented on Ms. Robinson's vehicle, stating "Nice Jeep, I see you just got it," and requested Ms. Robinson's driver's license, while also asking where Ms. Robinson worked, to which Ms. Robinson informed said officer that she owned a bail bond company.

24. Ms. Robinson commented to the officer that she was unaware someone could be stopped for a wellness check.

25. To that, the officer smiled, returned Ms. Robinson's license, and told Ms. Robinson to have a good night.

26. On a different occasion, while driving her Mercedes-Benz, Ms. Robinson was stopped by a male and female officer who advised that she was speeding.

27. Ms. Robinson informed the officer that while she understood that she could potentially receive a citation for holding her phone, Ms. Robinson did not believe she had been speeding.

28. In fact, Ms. Robinson explained that she began recording the entire event, because she noticed the officers following behind her.

29. At that point, Ms. Robinson advised that she was actually driving below the speed limit.

30. The officers returned to their patrol vehicle for several minutes, and the male officer later returned and informed me that I was free to leave.

31. Prior to the event at issue in this case, there were also several occasions where officers followed behind her while she was driving home.

32. During these situations, Ms. Robinson paid very close attention to maintaining the posted speed limits, particularly when limits changed between 20, 30, and 35 miles per hour.

**C. The Night of Ms. Robinson's arrest.**

33. On the night of her arrest, Ms. Robinson was driving home while eating an ice cream sundae and noticed a police vehicle following her, so she paid careful attention her speed.

34. Poplawski was driving his vehicle following Ms. Robinson, and followed her for about five to ten minutes prior to pulling her over for a traffic stop.

35. The traffic stop, which occurred on June 2, 2025, in Gallatin, TN, happened because as Ms. Robinson placed her ice cream sundae into the center console, the left tire of her Jeep drifted onto the yellow center line of the road she was driving, for a brief moment.

36. Once Ms. Robinson safely pulled over, Poplawski approached her car and abruptly opened her passenger door.

37. Then Poplawski stated to Ms. Robinson that he observed her vehicle move onto the yellow line and it was because she was eating ice cream.

38. Poplawski cautioned her that eating while driving is illegal but she never got a citation for that alleged offense.

39. Ms. Robinson was frightened by Poplawski opening her car door and expressed calmly to the officer that she was tired of being repeatedly stopped and feeling as though she was being continuously targeted or "messed with" by law enforcement.

40. Because Ms. Robinson felt frightened and intimidated, she informed Poplawski that she would call 911 to obtain a non-emergency number or speak to someone regarding her request to speak to a supervisor.

41. Ms. Robinson explained to Poplawski that she was unfamiliar with Sumner County's non-emergency number, but Poplawski simply told her that calling 911 was a crime.

42. Ms. Robinson called 911 and while trying to explain to the 911 operator that she needed a non-emergency number, Poplawski loudly identified himself to the dispatcher and either the dispatcher or another officer quickly provided the non-emergency number before the call ended.

43. As more evidence that Ms. Robinson was not impaired, the magistrate even acknowledged that Plaintiff was clearly not impaired and allowed her to be released.

44. After the dispatcher ended the call, Poplawski became angry and began yelling at Ms. Robinson, repeatedly ordering her to get out of her vehicle.

45. In response, Ms. Robinson, scared to death at this point, asked Poplawski if she could retrieve her badge holder because it contained her driver's license and identification, but Poplawski refused to permit her to do so.

46. Ms. Robinson complied with Poplawski's command and exited her vehicle, and at this point, the officer handcuffed Ms. Robinson, claiming he was only detaining her.

47. Ms. Robinson informed Poplawski that the handcuffs were too tight and instead of loosening them, Poplawski made the handcuffs tighter.

48. Poplawski then asked Ms. Robinson if she had any medical conditions, to which she responded that she is a Type II Diabetic and has high blood pressure.

49. Poplawski then asked whether she had her medication and she replied that she did.

50. Ms. Robinson requested to call her mother, who arrived at the scene, and also Poplawski's supervisor arrived at the scene.

51. With Poplawski, Ms. Robinson, her mother, and Poplawski's supervisor all at the scene, Ms. Robinson began to take a field sobriety test.

52. During the finger-to-nose test, Ms. Robinson easily touched her nose with the pad of her finger but Poplawski claimed that, because she did not touch the tip of her nose with her fingernail, there could be a problem.

53. During the walk-and-turn test, Ms. Robinson explained that she suffered from neuropathy in her feet due to her diabetes and that it can affect her balance, so she offered to talk a breathalyzer test as well just in case.

54. Poplawski claimed that breathalyzer tests are not performed anymore.

55. The officers then huddled up and Ms. Robinson heard one officer ask Poplawski what he wanted to do, and Poplawski responded that he wanted to arrest her.

56. Ms. Robinson's mother literally pleaded with the officers not to take Ms. Robinson to jail.

57. Furthermore, the officers treated Ms. Robinson's mother very rudely.

58. While Ms. Robinson was in the back of the patrol car, officers searched her Jeep, but found nothing. No containers. No drug paraphernalia.

59. Poplawski searched her purse where they found Ms. Robinson's diabetic medication in its prescription bottle.

60. The officer stated out loud "Metformin," and then Ms. Robinson saw the other officer using his phone as if he was researching what Metformin was.

61. Ms. Robinson continued to complain about the handcuffs being too tight, and that is when Poplawski handed her paperwork for a blood test.

62. Ms. Robinson gladly accepted the opportunity to take a blood test.

63. Poplawski transported Ms. Robinson to a nearby hospital to draw blood and once they arrived, the officer insisted on helping Ms. Robinson up a flight of stairs because she was handcuffed.

64. While assisting her, Poplawski literally told Ms. Robinson that he knew she was not drunk.

65. After leaving the hospital, Poplawski took Ms. Robinson to jail, where she was fingerprinted, photographed and placed in a holding cell like a common criminal.

66. While Ms. Robinson was in the holding cell, Poplawski told jail personnel to leave her in the cell for a while.

67. Ms. Robinson remained in the holding cell for approximately five hours.

68. Ms. Robinson began banging on the glass requesting her phone call and to appear before a magistrate and finally someone let her make a call.

69. Eventually Ms. Robinson was brought before a magistrate judge, who spoke with Ms. Robinson about the circumstances.

70. The magistrate then told Ms. Robinson that she did not believe that Ms. Robinson was intoxicate at all, and thus released Ms. Robinson on a $4,000 bond.

71. Significantly, the magistrate stated that prior to talking to Ms. Robinson she was not prepared to release her but after talking with Ms. Robinson it was clear that she should be immediately released with a much lesser anticipated bond of $4,000 bond.

72. For nearly a year, Ms. Robinson lived with stress, uncertainty, embarrassment, and the emotional burden of pending criminal charges.

73. The charges finally got dismissed in October 2025 when a nolle prosequi was entered.

74. After the charges were dismissed, Ms. Robinson moved back to Nashville, TN because she no longer felt safe in Gallatin and the incident changed the manner in which she now views law enforcement.

75. As more evidence that Ms. Robinson was not impaired, she submitted to a blood test and she passed it with no alcohol present in her system, and out of paranoia, on the day of her arrest, she had an independent blood test done, and that too showed zero alcohol in her system.

76. Poplawski's stated reason for Ms. Robinson's arrest was DUI, yet, Poplawski also charged Ms. Robinson with abuse of the 911 system for calling 911—this is outrageous conduct and unlawful.

77. In addition to the blood test to which Ms. Robinson consented at the request of Poplawski, Ms. Robinson had an independent blood test done immediately after being released from the jail.

78. The two blood test resulted in zero detection of alcohol in her blood.

79. Ms. Robinson offered to take a breathalyzer and was turned down.

80. Ms. Robinson put her finger tip on her nose and Poplawski claimed that was wrong because she should have put the tip of her extended fingernail on her nose.

81. Poplawski retaliated against her for calling 911 by charging her with a crime for calling 911.

82. Poplawski also called for backup when there was no way in the world back up was needed as a form of intimidation.

## COUNT I

### 42 U.S.C § 1983--FIRST AMENDMENT RETALIATION
(*Against Poplawski*)

83. Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-82, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

84. Based in the facts to support this Count, Poplawski violated Ms. Robinson's First Amendment right to petition the government, including calling 911 to obtain a non-emergency 911 number, without fear of being criminally charged with abuse of 911.

85. Because of Poplawskis' retaliation, Ms. Robinson is entitled to all permissible damages under law.

## COUNT II

### 42 .S.C § 1983—FALSE ARREST
(*Against Poplawski*)

86. Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-85, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count

87. Based in the facts to support this Count, Poplawski did not have even arguable probable cause to arrest Ms. Robinson.

88. Because of Poplawskis' conduct, Ms. Robinson is entitled to all recoverable monetary damages permitted under governing law.

## COUNT III

### 42 U.S.C § 1983—MALICIOUS PROSECUTION
(*Against Poplawski*)

89. Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-88, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

90. "Reflective of the fact that false imprisonment [arrest] consists of detention without legal process, a false imprisonment ends once the victim becomes **held** *pursuant to such process*--when, for example, he is **bound over by a magistrate or arraigned on charges**. Thereafter, unlawful detention forms part of the damages for the "**entirely distinct" tort of malicious prosecution**, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* **of legal process**." [Wallace v. Kato, 549 U.S. 384, 389-90, 127 S. Ct. 1091, 1096 (2007)].

91. Based in the facts to support this Count, but for Poplawski, legal process would never have ensued against Ms. Robinson and continued until the charges were dismissed.

**COUNT IV**

**TENN. CODE ANN. § 8-8-302 LIABIITY OF DEFENDNAT SUMNER COUNTY FOR THE WRONGS OF IT DEPUTY POPLAWSKI**
(*Against Sumner County*)

92. Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-91, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

93. Based on the facts incorporated to support this Count, Sumner County is liable for the wrongs/unlawful acts of Poplawski because Poplawski was appointed by the Sumner County Sheriff as a deputy and at all times relevant, Poplawski was acting under color of the Sumner County Sheriff's Office. Thus, Sumner County is liable to Plaintiff up to a certain monetary amount established by governing law.

94. T.C.A. § 29-20-201(a) generally provides municipalities and governmental entities with immunity from suit.

95. However, based on the conduct and negligence of Sumner County employees and pursuant to T.C.A. § 29-20-205 (1) (2), to the extent that it would be argued to exist, which Plaintiff asserts that it does not, the

Tennessee Governmental Tort Liability Act immunity is removed from Sumner County, if it ever existed at all.

## COUNT V

### 42 U.S.C. § 1983—FAILURE TO ADEQUATELY TRAIN
(*Against Sumner County*)

96. Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-95, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

97. Based on the facts incorporated to support this Count, Sumner County failed to adequately train Poplawski or its assisting officers, including the failure to adequately train Poplawski with respect to DUI traffic stops.

98. Ms. Robinson displayed zero signs of having a drop of alcohol in her system, as evidence by two blood test that demonstrated zero alcohol in her system, and Poplawski himself telling her that he, Poplawski, knew she was not intoxicated.

99. Yet Poplawski arrested Ms. Robinson claiming she was intoxicated. Sumner County failed to adequately train Poplawski on DUI despite knowing that Poplawski had, as a deputy, a high probability of encountering civilians suspected of driving while under the influence.

100. The County's failure to train Poplawski caused direct and proximate injury to Ms. Robinson; as such, Ms. Robinson is entitled to all recoverable damages under the law.

**WHEREFORE**, Ms. Robinson prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) The process issue and service be had on each Defendant;

(b) That judgment be granted in favor of the Plaintiff against the Defendants, jointly and severally, for the injuries of Plaintiff;

(c) That Plaintiff recover compensatory damages including pain and suffering, punitive damages (only against *Poplawski)*, special damages and other expenses in an amount to be determined at trial;

(d) Plaintiff be awarded attorney fees and cost pursuant to all applicable law;

(e) That a jury trial be had on all issues so triable; and

(f) That Plaintiff receives such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Terrell Tooten*
Terrell Tooten, BPR 28506
Attorney For Plaintiff
1160 Vickery Lane, Ste 204
Cordova, Tennessee 38016
Mailing Address: P.O. Box 3014
Memphis, TN, 38173
(901) 609-3622, x99tooten@gmail.com